Thank you both for excellent arguments. All right, our next case is King v. Lawson. We're going to take just a moment and wait for the courtroom to settle, and then we will get started. All right, whenever you're ready, Ms. Birch, we will hear from you. May it please the court, Tippie Birch for Appellant Eddie James King. Mr. King completely lost sight in his right eye while he was incarcerated at Dooley State Prison. Mr. King's blindness in his right eye occurred after he made repeated complaints of decreasing vision, eye discomfort, and pain to Defendant Lawson, who was a family nurse practitioner assigned to Dooley State Prison at the time. But as Mr. King's condition worsened, he received no treatment and was not referred to an ophthalmologist for five weeks. We're here today because the trial court erred in adopting the report and recommendation of the magistrate judge and in granting summary judgment to Defendant Lawson. This court reviews this case de novo. And to put it another way, Mr. King's Section 1983 claims for violations of his Eighth Amendment rights should be decided by a jury in this case. Is there a reason, yes or no? Do you think, should we hold this case pending resolution of the in-bank proceeding in Wade v. McDade where we're kind of grappling with what the standard is for proving these deliberate indifference claims? Do you think it matters? It might matter. It might matter. I mean, I think that in this case, I think this case should be reversed regardless of the outcome there. No matter what the standard is you're saying, your claim meets it. Yes, that's what I'm saying. But I can understand the desire of the court for efficiency to await the decision in that case. Would you help me on that just so I understand that a little more clearly? So whether the standard is recklessness understood in the criminal sense or something more than gross negligence, wherever it falls wouldn't make any difference in this case? You think you've met either standard sufficient to take the deliberate indifference to the jury? Yes, Your Honor. I think we've met either standard. I think we've surpassed either standard. If this court disagrees with that assessment, though, I think it would be wise to await and thinks that it could, you know, it would depend on the outcome, then it would be wise to await the outcome of that. But here I think given if we take the facts as we're supposed to in this case and we take them in the light most favorable to Mr. King as the non-movement, including believing what he says, then I think the facts here show that we've met those standards on deliberate indifference. The record specifically shows that Defendant Lawson saw Mr. King for problems with his right eye on four occasions in 2016 before he was seen by an ophthalmologist. But in fairness, right, I mean, Lawson noted each time, right, that he should see an optometrist and finally said, all right, let's send him to an ophthalmologist, right? I mean, that's hardly doing nothing. It's pretty close to doing nothing. She wrote down, you know, for Mr. King to be seen by the optometrist who would come to Dooley State Prison. And there is a difference between the optometrist that comes by and the ophthalmologist that would require the, you know, outward referral and consultation with the ophthalmologist. There's also an important difference between what optometrists and what ophthalmologists do. Yeah, no, I get that. I mean, I see both optometrists and ophthalmologists, but I don't think, I don't know, for purposes especially if we're in criminal recklessness land, that it would be criminally reckless to refer someone with eye problems to an optometrist, at least in the first instance, right? I think given the, you know, perhaps if we were talking about a shorter amount of time or fewer number of visits that Defendant Lawson had seen Mr. King and there was a quicker switch to an ophthalmologist, I mean, maybe that would be a circumstance where I could agree with that. But I think under the circumstances here, and I've tried to think of what the right analogy for this is, and one thing that has occurred to me that's not perfect is the difference between a dentist and an orthodontist. You've got a problem in your mouth, you want to see one of those two people most likely. All sorts of other people you might need to see as well. But this is sort of the equivalent with like, here's how I'm thinking of it, sort of agreeing to... Is it maybe more like a hygienist than a dentist? I'm sorry? Is it maybe more like a hygienist than a dentist? Maybe. My thought about the difference between the orthodontist and the ophthalmologist is that an optometrist is usually using, looking at ways to correct vision using, you know, glasses, contact lenses, that kind of thing, and the way that an orthodontist might be looking to correct the alignment of teeth or the alignment of a jaw, whereas an ophthalmologist is looking more at, you know, By producing the central concern, the ability has applied in this case, the ability to discern a detached retina. And isn't an optometrist perfectly capable of discerning that as well as an ophthalmologist? It might be different if you sent him to a skin doctor and said, does he have a detached retina? But it struck me that for purposes of this case and for the diagnostic issue of discerning detached retina, that an optometrist, at least to begin with, was perfectly capable of discerning a detached retina. Couldn't do anything about it. Would have to go to a surgeon, an ophthalmologist who operated on the detached retina. But for purposes of discerning, diagnosing, is there a dime's worth of difference between the two? I acknowledge that there is a difference between saying an optometrist and a skin doctor here. And then an optometrist likely could, you know, immediately diagnose this and then There's no real question about that. I don't think there is any real question about that. The problem here is that Mr. King did not get to see an optometrist. Was that Lawson's fault? Remember, we only have one defendant here, Nurse Lawson. We don't have the warden. We don't have the prison. We don't have anyone. The optometrist for not seeing him. All we have is Nurse Lawson as the only defendant in the dock. Absolutely, Your Honor. That is all we have left. And here, after the passage of several visits, Mr. King goes in June 29. She writes down for him to see the optometrist. He goes back in July 13, hasn't seen the optometrist. August 3, hasn't seen the optometrist. At some point, that becomes urgent enough that something needs to be done to refer him to the correct person or ensure that the optometrist, you know, consult that everything has been done properly so that that is going on. Under the rules of the prison, did she have the power to direct that the prison officials send him to Jones or Smith? Or could she only write a script, send it on, and say, in my judgment, he should see an optometrist, an ophthalmologist, or whatever? But she didn't have the decision-making authority to compel that. Do I have that right? You're correct. She did not have the decision-making authority to compel that. She could make the request. So if she couldn't compel it, what else should she have done? I know you think she should have referred to an ophthalmologist, but she couldn't have compelled that either, right? She could have made the request, and she can also mark the request as urgent. And ultimately, that's what happened. She did request the consult with the ophthalmologist and marked it as urgent. Unfortunately, by the time that Mr. King saw the ophthalmologist on August 18th, he had completely lost it. All right. So I'm sorry to interrupt, but I just want to make sure I'm understanding. I have thought that part of your claim was that she had repeatedly referred him to an optometrist instead of an ophthalmologist, and that was problematic because an optometrist, this wasn't really within his wheelhouse or whatever. But your real problem is that she didn't take steps to mark it urgent and send him to an ophthalmologist because that would have ensured that he actually saw someone. Is that? I think it's both things. I think it's that she got the provider, the recommended provider, wrong in the first instance. But you've already said that you think that an optometrist could have diagnosed this without a problem. And I think if on June 29, when she referred him to the optometrist, if he had then seen an optometrist, ideally then that optometrist could have immediately referred him to an ophthalmologist. But she didn't do that. So it's a combination of things here, really, that she failed to do that lead us to the deliberation. But it's really that she didn't have the power to ensure that he saw the optometrist, but she had the power to ensure that he saw an ophthalmologist. And she didn't use that power until too late in the process. That's really what your claim is. Is that fair to say? I just want to make sure I understand. That's fair to say. I think there's a dual problem here. I think if things had taken, you know, another course, that we wouldn't necessarily have the problem that we have here today. And I think the problem is twofold, that she referred to, that she wrote down for the optometrist who had come by to see, and did not make the immediate or more quick referral to the ophthalmologist, and that she didn't make that an urgent request soon enough. Let me break this down so I understand what is deliberately indifferent on the part of the defendant. Was it deliberately indifferent in your view on June 29th, the first time, 2016, that King sees the nurse practitioner and he says there's something covering his left eye, he complained of pain, and he said his right eye was watering and red, and that his vision was deteriorating. That's what he said on round one. Lawson immediately recommended that he see the optometrist, filled out the physician's order, directing the prison to schedule an appointment, and so on. She didn't mark it as urgent, and she didn't designate an ophthalmologist. Was that deliberately indifferent on June 29th? Was that something beyond gross negligence? I don't think, I don't know that we get to deliberate indifference on June 29th. Okay, so bear with me. What she did wrong, but I don't know that we get to deliberate indifference. What she did wrong, you mean she was obliged to mark that urgent and mark the ophthalmologist as the designated hitter to see him? I think that's what she should have done, yes. Perhaps that would have been better. The question is whether it was deliberately indifferent not to do that. I don't think on June 29th. I think it would be hard to say. Okay, so that's not deliberately indifferent. July 16th, 17 days later, King comes back, and he complains his vision was still blurry, saying he had not yet seen the optometrist. He complained about that, and he said his vision in the right eye was getting worse. She notes the vision is getting worse, and again directs that he see the optometrist, but did not say see the ophthalmologist and did not mark that urgent. Was that deliberately indifferent, whether the standard is something more than gross negligence or criminally reckless? I think it is deliberate indifference at that point. I think that's where we've crossed the threshold. The condition has worsened. The optometrist, Mr. King has not seen the optometrist. I think at that point, we crossed the line for deliberate indifference under either standard. Okay, August 3rd, he comes back. He says the problem is getting worse. She submits a request that he see an ophthalmologist and marks it as urgent. Was that deliberately indifferent? She did everything you wanted her to do on August 3rd, right? She did do everything that we could ask, I suppose, of her to do on August 3rd. Her failure to do that earlier. Okay, so the case, your entire case of deliberate indifference, you agree it didn't happen on June 29th. It was enough to say optometrist and not mark it urgent, and what she did on the 3rd of August was all she could do, urgent ophthalmologist, so the case turns on July 16th, the second visit where, again, she says he should see the optometrist, and the prison doesn't do it. I think that really is the key visit and the key time frame here. I think there might have been a little bit more she could have done on August 3rd, but I think the real focus here is on that second visit. Let me ask one final question. Even if the evidence is sufficient to take to a jury the question of whether the nurse defendant knew of the sufficient risk and didn't respond properly, is there any evidence of causation? The third prong, of course, is to this whole deliberate indifference inquiry is causation. You'd have to show that the injury was caused, that is to say the detached retina, by the five-week delay in the treatment. Is there any evidence to that effect in this case? Yes, Your Honor. I think the worsening of the condition over time itself is evidence of that. Mr. King also provided information that doctors had advised him that had he seen them sooner, more could have been done to save his sight. Thank you. All right. Thank you, counsel. We'll hear next from Mr. Draper. Thank you, Your Honor. In most deliberate indifference cases the question is just how badly the defendant messed up, but not here. Because here Christy Lawson did everything she was supposed to do to get Eddie King treatment for his eye. Well, I mean, it was over an extended period of time. He kept coming back. His symptoms were pretty bad, and it took about a month before she actually referred him to an ophthalmologist and marked it urgent. So I'm not sure I fully agree that she did everything she could have done. So she had two parts. First, whether she should have sent him to an ophthalmologist instead of an optometrist, and then second, the sort of amount of time that passed. First. It's more like the urgent part of it, making sure that he actually saw a medical professional. Right. So on that point, there's no indication in the record. In fact, the indication is that Christy Lawson doesn't have any role in sort of expediting or approving or scheduling visits with these specialists after she submits either a referral to the optometrist or a request for a consultation with the ophthalmologist. I'm sorry. What is the role of if any? Maybe there isn't. If she writes urgent on something, does that have an impact on the scheduling? I imagine it does have some impact. I'm not entirely aware of exactly how expedited that becomes. It's not apparent that she was able to submit an urgent request for a referral to the optometrist. The form she submits for the outside consultation request for the ophthalmologist actually has a box that she can check to mark as urgent, which she did check. And then when she submitted that request, it has to go through an outside approval process with the Department of Corrections. And the next step, the approval with the Department of Corrections took place I think the very next day. So it was a pretty quick process. And then King saw the ophthalmologist just I think it was about two weeks after she submitted that referral. Under the rules of the game here, when you say it has to go to the outside department, is that in the prison itself or is that some other part of the prison bureaucracy? It's another part of the Georgia Department of Corrections. Well, it's a multi-step process. So when she submits the request for an outside consultation, first it has to be approved by the medical director at Dooley State Prison. Once they approve it, then it goes to sort of a bureaucratic process. It's called the Utilization Management Team at the Georgia Department of Corrections. So that goes to the Department of Corrections outside of the prison. And they're the ones that are ultimately responsible for designating the outside specialists. So the reason I ask the question is we know only Nurse Lawson is the defendant here, but he was pro se. He didn't have the presence in the mind to name other prison officials, the warden, the Department of Corrections or whatever, where the buck ultimately would have stopped. But I'm correct, am I not, that on August 3, she says he's got to see an ophthalmologist. On August 3, she says this is urgent because undoubtedly she knows and she doesn't have to be an expert that whatever happens with a detached retina, you've got to move quickly. That's really the heart of the problem. So she marks it urgent. She says see an ophthalmologist. And nothing happens until August 18 when he sees the outside ophthalmologist. And by that time, he's blind in his right eye. Is that an accurate description of the record evidence? Yes, it is an accurate description. She submitted the request for the consultation with the ophthalmologist on August 3. It was internally approved at the prison on August 4. He did not end up seeing the ophthalmologist until August 18. That's correct. She has no role in sort of scheduling that. No, I understand. That's correct. The other thing I would mention, there's no evidence in the record that she was ever aware, even if you credit all of the claims that King was making about what he said to Lawson at their visits. There's no evidence that she was ever aware that he had a detaching retina at most, even if you credit everything he's saying. She was simply aware that he had pain in his eye and was having trouble seeing. Should we require that level of specificity with respect to the knowledge of the risk? I mean, I don't know, if you have an elderly patient who presents who can't breathe, are we going to require the caregiver to understand that it's COPD as opposed to emphysema as opposed to lung cancer or whatever? Well, I think a crucial part of the inquiry in deliberate indifference is you have to assess the reasonableness or the sufficiency of the defendant's response based on what they were subjectively aware of. So obviously, if you go to your generalist doctor and you say to them, I'm having some pain in my eye and trouble seeing, they'll probably send you to an optometrist, and the optometrist, as Your Honor has noted, would be in the best position to, one, correct the vision, but then, two, diagnose to see if further treatment is required. If King had come to Lawson and his eye was bleeding and it was just totally nonfunctional and he was having trouble going about his daily activities, then that would have been different, more severe information, and maybe we would have expected a more urgent response from her, and maybe we would have expected that even on her generalist knowledge, she would have known it could have been a more severe condition like a detaching retina, and she should have sent him to the ophthalmologist. I guess the point I'm making is I agree with you that a red, watery eye and a bleeding eye are two totally different things, but you're not suggesting, are you, that she needed to look at him and come to like an ah-ha subjective moment, I bet he has a detached retina. You're just saying that she needs to have thought, like, this is a holy cow moment, this is really bad, not that she needs to, like, diagnose the specific condition. I think she needs to be subjectively aware that he has a condition. She may not know specifically what condition it is, but she needs to be subjectively aware that he has a condition that necessitates a certain level of treatment, and I think the important thing to understand here is even if a patient has some pain in his eye and some trouble seeing, that's sort of the stereotypical case we're going to an optometrist, or at least it's the kind of thing an optometrist would know how to treat or diagnose better than a generalist nurse like Ms. Lawson. Got it. The other thing I do want to, just to circle back, I do think it's important to understand, you know, the number of visits here may be a bit deceiving in terms of making it seem like a lot more time passed here than really did, but the evidence on the record, the best thing we can surmise is that the optometrist probably only comes to the prison once a month, and after their initial meeting on June 29th, Christy Lawson submitted a physician's order indicating that Mr. King should see the optometrist this month, and then the second meeting on July 13th was only two weeks after that first meeting, and then it wasn't until the third meeting on August 3rd that it actually went that lap since the first meeting. Help me with that fact. I have not been aware of that. When the nurse saw him on June 29th and filled out the form and said he should be seen by an optometrist, did she also indicate in the notes that he should see the optometrist that month, or was that after the July 16th meeting? When I look at the record, will I find the answer to that? So to be clear, Your Honor, I don't think it's in the orders or notes that she filled out after the meeting, but it is. Sorry, I can't find the exact spot right now. But it's in the record that on one of these earlier visits she said not only let him be seen by an optometrist, but she said this month. Did she put a temporal state on it is all I'm asking. I can't say for sure, Your Honor, but I think the important thing is it's not clear at the very least exactly when the optometrist visited the prison, and I would not be surprised at all if the optometrist doesn't come to the prison on a two-week basis, but rather a monthly basis. Let me ask you a slightly different question about deliberative difference here. It's really a hypothetical question, and I know the only defendant is the nurse practitioner who saw him. But we know that it was marked urgent and see the ophthalmologist on August 3rd, and it doesn't happen until August 18th. And somewhere between the 3rd and the 18th, he goes blind in his right eye. If, in fact, the plaintiff had sued the proper prison officials, those who had the authority to get him urgent care from an ophthalmologist, if they were in the case, would that be sufficient to establish a tribal issue on deliberate indifference, whether the standard was something more than gross negligence or a criminal recklessness? If they did nothing for a period of 13 days in an emergency where the time frame really was critical? I think that would depend on a lot of factors we just don't have evidence for. So it would depend on sort of what the prison standard operating procedure is, how long, you know, how quickly they're even capable of getting into an ophthalmologist. I imagine there are a number of procedures, both security, finding the specialist, scheduling the visit that they have to go through for that. And then to determine, you know, whether there was the urgency, you know, whether they expedited that process quickly enough. I think there's just a lot of evidence we'd have to have that we don't have here. I do think it's important to understand the context for that, though. Even, you know, a prisoner, deliberate indifference, Constitution does not entitle a prisoner to the best possible medical care. It entitles them to essentially minimally sufficient medical care. Medical care that's at least sufficient to not be reckless disregard. And even, you know, for a normal person outside of prison, if you want to see a specialist like an ophthalmologist, to get a visit with them, you know, in two to three weeks, that seems pretty normal to me and to be demanding something more quickly than that. Well, not necessarily. I mean, if you tell the doctor there's an urgent situation, for example, I mean, whatever the urgent situation may be, often doctor's office will squeeze you in. They might. And I think that might be that might be the most reasonable thing to do. But it's certainly not. It's certainly not. One, I don't think it's unreasonable for it would be unreasonable for the ophthalmologist to say, OK, my next available visit is two weeks from now. You have to come in then. But also, I think even if the ophthalmologist, even if you weren't able to be squeezed into the ophthalmologist, didn't quite appreciate the severity of your condition based on telling him that you had pain in your eye. If he were to if he were not to see you quickly enough, that would, I think, at most. Of course, there's more than just pain in the eye here, right? There was blurriness. There was a statement that the vision deteriorated. He said over a period of time he could see less well and then less well. And then finally he said, I can't see at all. At one point, there's a discussion of floaters of things. So this is sort of a work in progress. And I take your point that there are limits to what you can expect from an initial viewing by this first nurse in the case. But let me ask you this. What evidence does he have to put in in order to beat back a motion here that the third problem was established? That is to say, this question of causation. What did he have to do as a matter of law? And did he need it? And if not, why not? Well, I think at the very minute, at the very least, he has to put in some evidence that goes to causation. He can't say that I was having eye problems. She didn't send me to the ophthalmologist, and then I eventually went blind. The important thing, again, to give context, there's as a matter of, you know, technically there's no evidence in the record that King put in. He didn't put any sort of deposition, any kind of verified evidence. All the statements he's relying on are statements he sort of made in the midst of his summary judgment briefing, which of course are evidence. But even if you do want to credit everything he said there, he would have to put in some kind of evidence showing that if Lawson, and as I take Mrs. Birch's statements during her argument, he would have to put in some kind of evidence that if Lawson on July 13th had sent him to an ophthalmologist, that he would not have gone, he would not have suffered the ultimate condition that he did suffer, which I guess in this case would be that he didn't have the detaching retina or permanent blindness. Right. He has to show that the delay caused the blindness. I understand that, but I'm asking how does he have to show it? Is he required under our case law, for example, to put in competent medical evidence? I think eventually he would be. And one very easy way to do that would have been to go to another ophthalmologist or some kind of eye specialist and get them to submit either a deposition or eventually a trial through testimony to say, you know, based on my understanding of how quickly these conditions usually progress and looking at Mr. King specifically, I think that if he had been treated two weeks sooner, the condition wouldn't have ended up as bad as it did. But, you know, even if you don't require verified medical evidence, he at least needs to put in some kind of evidence describing the time more accurately, describing, you know, I mean, just something in there to indicate to at least a lay person why the loss in not submitting the request two weeks sooner led to his condition being as bad as it was. And he just hasn't put in any evidence. Can I ask you a question? Because I take your point about the lack of causation evidence. On what basis did the district court conclude, I think, frankly, in the serious medical need piece of the analysis, but the district court said something like, a reasonable jury could conclude that the delay in specialist treatment exacerbated his condition resulting in blindness. Where does that come from? I think the district court was just trying to draw a conclusion based on the sequence of events that Lawson did not submit the ophthalmologist's request sooner and then King ultimately did go blind and was sort of thinking that from that you could basically draw the inference. But I don't think the sequence of events is enough to lead to a causal inference. I think you need to put in some kind of evidence, testimony from a specialist, or at least something in there to indicate that it was because she did not submit the request sooner that his condition was as bad as it was. And it very much could be the case that that wasn't true. It could be the case that his condition was so bad by June 29th when he first saw her that there was nothing any specialist could have done and his retina would have detached anyway. But he hasn't put in any evidence either way on that question. So I'm not sure. I don't think the district court was correct in that assessment. Okay. And with that, I'm happy to take my seat. Thank you very much. All right. Thank you, Mr. Draper. And we'll hear again from Ms. Birch. Ms. Birch, can I ask you a question at the outset about this causation issue? And it's a sad case. He was unrepresented. He went into position to put in medical evidence to establish causation. But there's no question but that, per se or not, he is obliged to show the third prong. He's got to show causation. And the claim here was the delay in the treatment caused the blindness because he had a detached retina, and they didn't get to it quick enough, if I have it right. We have case law that says where a prisoner argues that his injury was caused by a delay in treatment, quote, he must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment, Hill v. DeKalb. What do we do with that? Your Honor, Hill v. DeKalb was looking at, talked about verified medical evidence in looking at, it actually was not looking at the causation prong when it talked about verified medical evidence. The court was talking about the seriousness of the medical need, which the district court found was met here, and I think everyone pretty much acknowledges the seriousness of the medical need here. So that language that comes from the Hill v. DeKalb case is really talking about a different prong, and I think that's pretty important. So Hill v. DeKalb was different than this case. It was also a very unfortunate case. Right, but so from your viewpoint, you could prove causation independent of actually putting on a medical professional. I think that's correct. I don't think under Hill that I'm required to put up verified medical evidence at this stage. Accepting that is true. What competent evidence is there in the record that created a debatable fact issue about causation? What evidence is there that any court could rely upon to say this could go to a jury, from which a jury could say causation has been met? Notably, the district court did already say here that a reasonable jury could find that the delay resulted in the blindness. I think we also have the statements of Mr. King that the condition continued to get worse and that upon seeing specialists, that they advised him he had not gotten there soon enough. He is ready to put on that testimony at trial from those specialists, and he has made statements in the record to indicate that. But unfortunately, the promise to do something later isn't sufficient for evidentiary purposes now. No, but that's the type of evidence that I don't think is required now. I do think that he needs it to convince a jury of his claim, and he is ready to put that up. And I'm sorry, you're relying on our line of cases that says that for summary judgment purposes, as long as the party makes clear and presents evidence that there are witnesses who will be able to provide competent evidence, that is sufficient. I think that is sufficient. That's correct. And we have the statements from Mr. King here. That is what we have, the statements from Mr. King saying his experience and saying what happened once he did see a specialist and his ability to put on that testimony from the specialist. The problem with the we can put something on that we could establish it later is you've got to be able to reasonably, confidently predict that you can put on a competent witness who could say the delay of three weeks or five weeks caused the detached retina. And it's not clear to me that you could actually get a professional to say that. Maybe you could, maybe you couldn't. I don't know. Mr. King has let us know that professionals have told him that. And at this stage, we're supposed to believe Mr. King. This is summary judgment. He just wants to get his case before a jury. That's what should have happened here, and for those reasons, this court should reverse the trial court's grant of summary judgment to Defendant Lawson. All right. Thank you very much to both of you, and thank you, Ms. Birch. I understand that you took this case pro bono. We always appreciate volunteerism from the attorney community. Thank you very much.